IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| W6 RESTAURANT GROUP, LTD, *et al.*, | ) | CASE NO.  1:21-cv-2361 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| v. | ) | |
| | ) | |
| ISABELLA CASILLAS GUZMAN, *et al.*, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendants. | ) | |
| | ) | |

Plaintiffs—a group of 15 restaurants—sued the Small Business Administration under the Administrative Procedure Act for its administration of the Restaurant Revitalization Fund.  This matter is now before the Court on the Small Business Administration's fully briefed motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  (Doc. Nos. 90, 93, 95.)  For the reasons explained below, the Small Business Administration's motion under Rule 12(b)(1) is **GRANTED**, and this case is **DISMISSED**.

## I.   Background

### A.   Factual Background

In March 2021, Congress passed, and President Biden signed, the American Rescue Plan Act ("ARPA").  *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 (2021) (codified as 15 U.S.C. § 9009c).  ARPA sought to shield the United States' economy from the wide-ranging impact of the COVID-19 pandemic.  Among other things, ARPA established the Restaurant Revitalization Fund ("RRF" or the "Fund").  (Doc. No. 86, ¶ 24); § 9009c(b)(1).  It

did so to aid restaurants weathering the pandemic.  (Doc. No. 86, ¶ 24.)  Congress charged the

Small Business Administration ("SBA") with administering the RRF and appropriated $28.6

billion for the Fund.  (*Id.* at ¶¶ 25–26); § 9009c(a)(1), (b)(2)(A).  Only "eligible entities" could

receive grants from the RRF—specifically, restaurants who certified in good faith that: (1) the

current economic conditions made the grant necessary for their continued operations; and (2) the

restaurant did not apply for other funding from other ARPA programs.  (Doc. No. 86, ¶¶ 30–31);

§ 9009c(c)(2).  Once an eligible entity received funds, restaurants could spend the money on

certain qualifying expenses.  (Doc. No. 86, ¶ 27); § 9009c(c)(5).  Further, the funds had to be

spent during the "covered period."  (Doc. No. 86, ¶ 27); § 9009c(c)(6).  If funds were not used by

the end of the "covered period," the statute required that the "eligible entity shall return to the

Treasury any funds that the eligible entity did not use . . . ."  (Doc No. 86, ¶ 27); § 9009c(c)(6).

Originally, the "covered period" ended on December 31, 2021, but that date could be extended

by the SBA.  (Doc No. 86, ¶ 28); § 9009c(a)(3).  That extension could not go beyond "later than

two years after March 11, 2021."  (Doc. No. 86, ¶ 28); § 9009c(a)(3).  The SBA ultimately

extended the "covered period," which ended on March 11, 2023.  (Doc. No. 90, p. 3.)

    With respect to the application process, ARPA mandated that the SBA award funds to

"eligible entities in the order in which applications are received . . . ."  (Doc. No. 86, ¶ 32); §

9009c(c)(1).  That mandate was subject to one exception: during the first 21 days, ARPA

instructed the SBA to "prioritize awarding grants to eligible entities that are small business

concerns owned and controlled by women . . . veterans . . . or [the] socially and economically

disadvantaged . . . ."  (Doc No. 86, ¶ 33); § 9009c(c)(3).

    The SBA began accepting applications for RRF grants on May 3, 2021.  (Doc. No. 86, ¶

34.)  The response was overwhelming.  Within the first two days, the SBA received

approximately 186,000 applications.  (Doc No. 86-1, ¶ 6.)  By May 18, 2021, the SBA received

303,000 applications requesting approximately $69 billion in grants, far exceeding the $28.6

billion Congress appropriated for the Fund.  (*Id.* at ¶ 7.)  The SBA closed the application window

on May 24, 2021.  (Doc. No. 86, ¶ 37.)

When the SBA first started accepting applications, it accepted applications from all

applicants, regardless of the priority period.  (*Id.* at ¶ 35.)  However, the SBA only processed and

funded those applications that were determined to have priority status in the order in which they

were received.  (*Id.*)  Per ARPA, the priority period ended on May 24, 2021, 21 days after the

SBA started accepting applications.  (Doc. No. 86-1, ¶ 12); § 9009c(c)(3)(A).  Accordingly, on

May 25, 2021, the SBA started processing non-priority applications.  (Doc. No. 86-1, ¶ 13.)  On

May 27, 2021, the United States Court of Appeals for the Sixth Circuit declared that the priority

application portion of ARPA was unconstitutional.  *See Vitolo v. Guzman*, 999 F.3d 353 (6th Cir.

2021).  Following that decision, the SBA paused processing priority applications and continued

processing non-priority applications in the order in which they were received.  (Doc. No. 86-1, ¶

14.)  Given the initial volume of applications, however, a large portion of the Fund was already

distributed to priority applicants.  (Doc. No. 86, ¶ 40.)

On July 2, 2021, the SBA announced that the RRF fund was exhausted.  (*Id.* at ¶ 41.)

Following that announcement, in November 2022, the SBA announced that approximately $83.4

million in recovered funds was available to be reallocated.  (*Id.* at ¶ 43.)  That money was

redistributed to the next 169 applicants in line.  (*Id.* at ¶ 48.)  All told, on February 23, 2023, the

SBA announced that all grants from the RRF were distributed, and no money remained.  (Doc.

No. 90, p. 3.)

On June 3, 2023, Congress enacted the Fiscal Responsibility Act of 2023 ("FRA").  *See*

Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10 (2023).  Among other things, the FRA rescinded money previously allocated to certain COVID-19 relief programs.  Relevant here, Section 52 of the FRA "permanently rescinded" the "unobligated balances of amounts" made available through the RRF.  *Id.* at § 52 ("The unobligated balances of amounts made available by section 5003(b)(2)(A) of Public Law 117-2 are hereby permanently rescinded.").

In this case, Plaintiffs are 15 restaurants, each—with one exception—majority owned by one individual.  (Doc. No. 34-2, ¶ 2.)  Each restaurant filed applications for RRF grants.  (Doc. No. 86, ¶ 64.)  Plaintiffs' applications for RRF grants were not processed by the SBA.  (*Id.* at ¶¶ 66–67.)  Plaintiffs did not receive funds from the RRF.  (*Id.* at ¶ 68.)  However, two of the related entities, which are still named plaintiffs in this case, did: Star Bar & Grill and Westerville Restaurant Group.  (Doc. No. 93, p. 5.)  As it stands, Plaintiffs have not severed these entities from this case.

B.    **Procedural History**

Plaintiffs initiated this action on December 17, 2021.  (Doc. No. 1.)  Since then, Plaintiffs have amended their complaint three times, each time modifying their theory of the case.  (Doc. Nos. 30, 50-1, 86.)  The operative complaint is the third amended complaint, which Plaintiffs filed on August 30, 2023.  (Doc. No. 86.)  The third amended complaint asserts two claims arising under the Administrative Procedure Act ("APA"): (1) failure to comply with 15 U.S.C. § 9009c(c)(1) because the SBA did not process applications for RRF grants in the order in which they were received; and (2) failure to comply with 15 U.S.C. § 9009c(c)(6) because the SBA has failed to develop and implement policies to recover RRF grants awarded to ineligible entities.  (*Id.* at ¶¶ 78–92.)  From these causes of action, Plaintiffs request the Court enjoin the SBA from closing the RRF program until all applications for grants are approved or denied and from

closing the RRF program until all improvidently granted funds are redistributed to eligible entities.  (*Id.* at Prayer for Relief, ¶ 1.)  Plaintiffs further ask for an order compelling the SBA to process all applications in the order in which they were received, develop and implement policies for the return of grant funds provided to ineligible entities, redistribute those returned funds to eligible RRF applicants, and require the SBA to submit periodic reports to this Court for monitoring.  (*Id.* at Prayer for Relief, ¶ 2.)

The SBA moved to dismiss the third amended complaint on two grounds: (1) lack of jurisdiction under Rule 12(b)(1); and (2) failure to state a claim under Rule 12(b)(6).  (Doc No. 90.)  The SBA makes three arguments under Rule 12(b)(1): (1) Plaintiffs lack standing under the APA to require the SBA to bring enforcement actions (relating to Count II); (2) Plaintiffs lack standing because their claims are too speculative for Article III standing (relating to Counts I and II); and (3) Plaintiffs' claims are moot (relating to Counts I and II).  (*Id.*)  As to failure to state a claim, the SBA makes three arguments: (1) the Court cannot compel the SBA to review the applications because Plaintiffs make impermissible programmatic arguments; (2) the denial of the Plaintiffs' applications do not constitute reviewable legal error by the SBA; and (3) the Plaintiffs' requested relief is not available under the APA.  (*Id.*)

## II.    <u>Law and Analysis</u>

The Court must first consider the SBA's jurisdictional arguments because without jurisdiction, the Court may not consider the Rule 12(b)(6) motion.  *Sinochem Int'l. Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) ("a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction" (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83 (1998))); *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) ("we are bound to consider the 12(b)(1) motion first, since the

Rule 12(b)(6) challenge becomes moot if this court lacks subject matter jurisdiction" (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946))).  Because the Court grants the SBA's motion pursuant to Rule 12(b)(1), the Court does not reach the SBA's Rule 12(b)(6) arguments.  Specifically, the Court finds Plaintiffs lack standing to require the SBA to bring enforcement actions.  The Court further finds that Plaintiffs' claims are moot.  The Court does not reach a conclusion on the SBA's argument that the claims are too speculative for Article III standing.  *See Ass'n of Am. Physicians & Surgeons v. U.S. FDA*, 13 F.4th 531, 536 (6th Cir. 2021) (explaining that courts "have discretion to choose between non-merits grounds for dismissing a suit" (citing *Sinochem*, 549 U.S. at 431)).

A.        **Rule 12(b)(1) Standard**

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a defendant may challenge a court's subject matter jurisdiction.  Rule 12(b)(1) motions come in two varieties: facial attacks and factual attacks.  *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014).  A facial attack on subject matter jurisdiction "goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction . . . ."  *Id.*  When a party asserts a facial attack, the court must "take[] the allegations in the complaint as true . . . ."  *Id.*  A factual attack on subject matter jurisdiction "challenges the factual existence of subject matter jurisdiction."  *Id.* at 759.  When a party asserts a factual attack, "a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case."  *Id.* at 759–60.  The SBA's Rule 12(b)(1) arguments raise a factual attack on this Court's jurisdiction.

**B.     The Plaintiffs Do Not Have Standing Under the APA to Challenge the SBA's Enforcement Decisions**

The SBA argues that Plaintiffs' complaint should be dismissed because Plaintiffs lack standing to compel the SBA to undertake enforcement actions.  In part, Plaintiffs seek a court order requiring the SBA to undertake enforcement actions to recover funds provided to ineligible entities.  (Doc No. 86, Prayer for Relief, ¶ 2 (requesting this Court issue an order requiring the SBA to "develop and implement policies for the return of grant funds from those who procured them fraudulently or are otherwise ineligible"); Count II, ¶ 89 ("To date, Defendants have failed and continue to fail to develop and implement policies and procedures . . . to address and recover RRF grants").)  These recovered funds, Plaintiffs say, should be redistributed to eligible entities.  As explained below, Plaintiffs do not have standing under the APA to request that this Court order the SBA to undertake enforcement actions to recover RRF grants provided to ineligible entities.

As an initial matter, the parties frame the standing issue differently.  Plaintiffs say this is a case about judicial review of an agency's policy to require the SBA to comply with the law.  (Doc. No. 93, p. 9.)  Because the SBA did not follow the law, Plaintiffs argue that the SBA is then obligated to make up for its noncompliance by implementing policies and procedures to undertake enforcement actions to recover money improperly dispersed.  (*Id.* at p. 11.)  The SBA, more plainly, says that this is a case requiring judicial review of an agency's decision to not prosecute violations of federal law and regulations.  (Doc. No. 90, at p. 8.)  While the parties dispute the posture of the case, Plaintiffs' requested relief seeks an order from this Court requiring the SBA to undertake enforcement actions.  Plaintiffs' case challenges the SBA's lack of implementation of enforcement actions to recover improperly granted RRF funds—funds that could then be recovered and redistributed to applicants, including, potentially Plaintiffs.  (Doc

No. 93, ¶ 89.)  In this way, Plaintiffs' case is not simply whether the SBA violated § 9009c(c)(1) in distributing funds—it is instead about whether the SBA's decision to not undertake enforcement actions to recover funds provided to ineligible entities is arbitrary or capricious. While Plaintiffs may also challenge whether the SBA acted arbitrarily or capriciously in dispersing the funds in the first instance, Plaintiffs' claims here go a step further and request judicial review of the SBA's decision to not pursue certain enforcement actions.  That challenge squarely asks this Court to review the SBA's decision to not pursue enforcement actions.

### 1.    Standing Under the APA to Request an Agency Undertake Enforcement Actions

The APA provides for judicial review of an agency's actions and inactions.  *Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (citing 5. U.S.C. §§ 701–706); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. ----, ----, 140 S.Ct. 1891, 1905 (2020) ("The APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action.") (citation and quotation omitted).  But judicial review is not permitted in two distinct situations: (A) when the relevant statute expressly precludes review; or (B) when the "agency action is committed to agency discretion by law."  §§ 701(a)(1), (2).  The SBA argues that the relief Plaintiffs seek here—an order compelling the SBA to undertake enforcement actions—is an "agency action committed to agency discretion by law" under § 701(a)(2) and is precluded from judicial review.  (Doc. No. 90, p. 8.)

The Supreme Court has repeatedly held that an agency's decision to not bring enforcement actions is an "agency action committed to agency discretion by law."  *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 680 (2023) ("in both Article III cases and Administrative Procedure Act cases, this Court has consistently recognized that federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or

bring more prosecutions"); *Chaney*, 470 U.S. at 838 (holding that, under § 701(a)(2), an agency's "decision not to take the enforcement actions requested by respondents is [] not subject to judicial review under the APA"); *Regents of Univ. of Cal.*, 140 S.Ct. at 1905 ("unreviewable actions includes an agency's decision not to institute enforcement proceedings"); *Massachusetts v. E.P.A.*, 549 U.S. 497, 527 (2007) ("an agency's refusal to initiate enforcement proceedings is not ordinarily subject to judicial review").

The Supreme Court first substantively interpreted § 701(a)(2) in *Chaney*.  There, inmates convicted of capital offenses petitioned the Food and Drug Administration to commence an enforcement action preventing the State from using certain drugs in their scheduled lethal injections.  *Chaney*, 470 U.S. at 828.  The FDA refused.  *Id.*  The Supreme Court held that the FDA's decision to not commence an enforcement action was unreviewable by federal courts because it was an "agency action committed to agency discretion."  *Id.* at 832.  This is so, the court explained, because "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Id.* at 831.  The reasons for this discretion are many.  To name a few, only the agencies themselves know how best to allocate precious resources, particularly where agencies simply cannot prosecute every technical violation of law.  *Id.*  And, as a more practical matter, "when an agency refuses to act" there is no action to "provide[] a focus for judicial review."  *Id.* at 832.

*Chaney* did not foreclose a federal court's ability to review an agency's non-enforcement decision—a court can review the agency's decision when the "substantive statute has provided guidelines for the agency to follow in exercising its enforcement power."[1]  *Id.* at 833.  As the

---

[1] The *Chaney* court also left open the potential for claims where the agency has "consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities."  *Chaney*, 470 U.S. at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d

court explained: "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* Thus, whether a court can review an agency's non-enforcement position turns on the substantive statute itself and whether that statute instructs the agency to exercise its enforcement powers in certain ways. If the statute does, then there is "law to apply" and § 701(a)(2)'s exception to judicial review does not apply. *Id.* at 836.

### 2. Plaintiffs Lack Standing to Require the SBA to Undertake Enforcement Actions

Here, the question is whether ARPA contains guidelines for the SBA to follow in exercising its enforcement power. It plainly does not. In fact, there is nothing within ARPA at all that relates to enforcement decisions for the SBA to follow in recovering RRF grants. (Doc. No. 95, pp. 2–3.) ARPA provides that the SBA "shall award grants to eligible entities in the order in which applications are received by the Administrator." § 9009c(c)(1). Plaintiffs seize on the "shall" and "eligible entities" language. (Doc. No. 93, p. 11.) In effect, Plaintiffs argue that because the SBA did not award funds to "eligible entities," the SBA violated Congress' mandate that funds "shall" only go to "eligible entities." (*Id.*) Since the SBA violated that mandate, Plaintiffs argue, the SBA is obligated to undertake enforcement actions to live up to the statute's command. (*Id.*) But the statute here does not provide any guidelines for enforcement actions to recover funds improperly distributed. On that point, this Court cannot evaluate the SBA's decision to not bring enforcement actions because there is no law to apply in that respect. While Plaintiffs focus on the phrase "shall," the mere use of "shall" "does not automatically create a judicially enforceable mandate, especially when criminal or civil law enforcement is at issue." *Arizona v. Biden*, 40 F.4th 375, 391 (6th Cir. 2022) (citing *Town of Castle Rock v.*

---

1159 (D.C.C. 1973)). Plaintiffs quote this standard but do not argue it applies here.

*Gonzales*, 545 U.S. 748, 761–62 (2005)).  To hold otherwise would greenlight APA actions for agencies' non-enforcement decision in every instance the underlying statute uses the word "shall."  Such a holding erodes agency discretion in bringing enforcement actions.  In short, Plaintiffs do not provide this Court with any language within ARPA to evaluate or scrutinize the SBA's enforcement decisions.

Plaintiffs argue that *Dunlop v. Bachowski* supports their enforcement theory.  421 U.S. 560 (1975).  But *Dunlop* only highlights the deficiencies in their case.  In *Dunlop*, a union employee filed a complaint with the Secretary of Labor requesting that the agency investigate a union election and sue to set it aside.  *Id.* at 562–63.  The Labor-Management Reporting and Disclosure Act required the agency to investigate upon receiving a complaint and, if it is determined certain violations occurred, to bring a civil action.  *Id.* at 563 n.2.  Specifically, the law provided that "the Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action . . . ."  *Id.*  The Secretary of Labor investigated but did not file a civil action.  *Id.* at 563.  On appeal to the Supreme Court, the parties disputed whether the federal courts could review the Secretary of Labor's decision to not file a complaint.  The Supreme Court held that the federal courts do.  *Id.* at 566.  Specifically, because the statute at issue required the agency to investigate and provided guidelines for when the agency must bring an action (upon a finding of "probable cause"), a court could review whether that agency complied with the statute's mandate or acted arbitrarily with respect to its decision to not initiate an enforcement action.  *Id.* at 571.  In *Dunlop*, the Supreme Court held that Congress did not leave it up to the agency's discretion.

The case before this Court is not like *Dunlop*.  Here, no part of ARPA provides a specific

mandate that the SBA undertake enforcement actions.  In fact, unlike the statute in *Dunlop*, ARPA does not set forth any command to undertake enforcement actions.  Moreover, unlike *Dunlop*, there is no standard of probable cause or anything else by which this Court could review the SBA's decision.  The *Chaney* court interpreted *Dunlop* in the same way: it explained that the statute in *Dunlop* "quite clearly withdrew discretion from the agency and provided guidelines for exercise of its enforcement power." *Chaney*, 470 U.S. at 834.  In this case, like in *Chaney*, there is simply nothing with which this Court could use to assess whether the SBA acted arbitrarily or capriciously with respect to declining to bring enforcement actions for improvidently granted RRF funds.

In short, while ARPA provides for guidelines about how funds should be distributed, it does not provide guidelines for how improperly provided funds should be recovered.  Because it lacks such language, this Court cannot review the SBA's enforcement action decisions.  In coming to this conclusion, the Court notes that it takes no position on the merits of Plaintiffs' contention that the SBA should, or should not, engage in enforcement actions.  Instead, the Court merely holds that the court system is not the proper forum to seek that determination.  *See Texas*, 599 U.S. at 684 ("our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action" but "[t]his case is categorically different . . . because it implicates . . . the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law"); *Heckler*, 470 U.S. at 834 ("The danger that agencies may not carry out their delegated powers with sufficient vigor does not necessarily lead to the conclusion that courts are the most appropriate body to police this aspect of their performance.").

Because Plaintiffs lack standing to command the SBA to pursue enforcement actions, this claim is dismissed.

### C.      The Plaintiffs' Claims Are Moot

Plaintiffs' claims are broader than judicial review of the SBA's enforcement decisions. For instance, Plaintiffs seek judicial review regarding whether the SBA followed its statutory mandate to distribute funds to "eligible entities."  (Doc. No. 86, ¶¶ 79–86.)  Plaintiffs also seek a declaration requiring the SBA to review and approve or deny all pending applications so that Plaintiffs know their true place in line.  (Doc. No. 93, p. 13.)  But to the extent Plaintiffs' case is broader than asking this Court to review the SBA's enforcement decisions, the case is moot.  The SBA asserts two arguments on mootness grounds, both of which the SBA argues are independently sufficient to moot all of Plaintiffs' claims.  (Doc. No. 90, pp. 11–12.)  First, the SBA argues that because the "covered period" for the use of RRF grants has ended, even if Plaintiffs are provided a grant, they would have to immediately return that money to the Treasury.  (*Id.* at p. 11.)  Second, the SBA argues that since the passage of the FRA, all "unobligated" funds must be returned to the Treasury, so even if more funds become available, such funds could not be reallocated to any entity, including Plaintiffs.  (*Id.* at pp. 11–12.)  The Court agrees that both the end of the "covered period" and, separately, the passage of the FRA, moots Plaintiffs' claims.

### 1.      The Live "Case or Controversy" Requirement

Article III of the United States Constitution limits a federal court's jurisdiction to "actual cases and controversies."  *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 458 (6th Cir. 2004) (citing U.S. Const. art. III, § 2).  Accordingly, federal courts "lack authority to issue a decision that does not affect the rights of the litigants."  *Id.* (citing *Sw. Williamson*

*Cnty. Cmty. Ass'n. v. Slater*, 243 F.3d 270, 276 (6th Cir. 2001)).  The doctrine of mootness "addresses whether the plaintiff continues to have an interest in the outcome of the litigation." *Ailor v. City of Maynardville*, 368 F.3d 587, 596 (6th Cir. 2004) (citing *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 525 (6th Cir. 2001)).  "If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give meaningful relief, then the case is moot and must be dismissed."  *Id.* (quoting *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001)).  The "test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties."  *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (citation and quotation omitted).  "The heavy burden of demonstrating mootness rests on the party claiming mootness." *City of Parma*, 263 F.3d at 531 (citing *Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).

There are two exceptions to the mootness doctrine.  First, if a defendant voluntarily ceased the allegedly improper behavior, the case will not be mooted unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).  Second, even where a case is moot, if the alleged injury is capable of repetition, the matter should not be dismissed. *Weinstein v. Bradford*, 423 U.S. 147, 148–49 (1975).

### 2.    The End of the "Covered Period"

When Congress passed ARPA, it put a time constraint on the time period entities receiving funds could use those funds.  *See* § 9009c(a)(3).  This was known as the "covered period."  *Id.*  Per ARPA, the "covered period" ended on December 31, 2021, or a later date to be determined by the SBA.  *Id.* at § 9009c(a)(3)(B).  In no case, however, was the "covered period" to extend beyond two years after March 11, 2021.  *Id.*  The SBA ultimately determined to extend

the "covered period" to the maximum amount allowed by ARPA.  (Doc. No. 90, p. 3.)
Accordingly, the "covered period" ended on March 11, 2023.  (*Id.*)  Eligible entities who
received grants from the RRF were required to use those funds for qualifying expenses during
the "covered period."  § 9009c(c)(6).  If an eligible entity failed to use any funds received from
the RRF, in whole or in part, that entity was required to return those funds to the Treasury.
Specifically, Congress mandated that "[i]f an eligible entity that receives a grant . . . fails to use
all grant funds . . . on or before the last day of the covered period, the eligible entity shall return
to the Treasury any funds that the eligible entity did not use . . . ."  *Id.*  Accordingly, all funds
dispersed from the RRF had to be used by recipients on or before March 11, 2023 or be returned
to the Treasury.

The SBA argues that because the "covered period" closed, even if the RRF is replenished
in some way, those funds could no longer be used by the Plaintiffs and would instead need to be
returned immediately to the Treasury.  (Doc. No. 90, p. 11.)  Essentially, the SBA argues that
since the Plaintiffs cannot "use" the funds on or before March 11, 2023 anymore, per the statute,
those funds, even if reallocated, would have to be immediately returned.  (*Id.*)

In a recent similar case involving the RRF, a court sitting in the Middle District of
Georgia found claims under the APA moot because the "covered period" expired, precluding the
use of any RRF grants even if the Fund was replenished.  *See Reboot Macon, LLC v. United
States*, No. 5:21-cv-221, 2023 WL 4672395, at *5 (M.D. Ga. July 20, 2023).  In *Reboot Macon*,
two restaurants brought an APA action against the SBA for failing to fund their RRF
applications.  *Id.* at *1.  While the plaintiffs were told their applications were accepted, the
plaintiffs never received funding.  *Id.*  The court dismissed the complaint on mootness grounds
for two reasons.  *Id.* at *4–5.  First, the RRF fund was exhausted, and so no money could be

distributed.  *Id.* at *4.  Second, and relevant here, because the covered period closed, the restaurants could no longer "use" the funds even if they now received the money.  *Id.* at *5.  On this point, the court interpreted the statute pursuant to its plain meaning.  *Id.*  The court held that because funds must have been used on or before March 11, 2023, the plaintiffs could not "use" the funds even if they were made available.  *Id.*  The court explained: "In the end, the Court is bound by the plain language of the ARPA which says that any funds not used during the covered period shall be returned to the Treasury."  *Id.*  Finding that the statute, as written, required monies be "used" by March 11, 2023, and with no exception provided for, "the plaintiffs' claimed injury has become non-redressable . . . ."  *Id.*  The fact that the SBA might have "bungled" the administration of the RRF such that plaintiffs were left without a grant when they might otherwise be entitled to one was of no moment.  *Id.*  Instead, ARPA says what it says, and Congress made no exception.  *Id.*  The court, finding that it could not rewrite the statute, dismissed plaintiffs' claims.  *Id.*

The same result follows here.  "We must presume that Congress says what it means and means what it says."  *Norfolk S. Ry. Co. v. Perez*, 778 F.3d 507, 512 (6th Cir. 2015) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)).  Thus, the court "must apply a statute as it is written, giving its terms the ordinary meaning that [Congress] carried when the statute was enacted."  *Id.* (citing *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 226 (2014)).  The statute here requires entities use RRF funds on or before March 11, 2023.  Indeed, Congress specifically mandated that date could not be extended further.  *See* § 9009c(a)(3) ("not later than two years after March 11, 2021.").  Because it is an impossibility for the Plaintiffs here to use the funds by March 11, 2023, their claims are moot.

Plaintiffs' attempt to distinguish *Reboot Macon* is unpersuasive.  Plaintiffs say that

because *Reboot Macon* was a factual attack on jurisdiction, requiring "extensive briefing" and "fact finding," their claims should proceed at least to discovery to resolve the factual issues here. But the court's holding regarding the statutory language of the "covered period" involved no such fact finding.  Instead, based on the language of the statute itself, the court held plaintiffs' claims were moot.  Plaintiffs also point out that the *Reboot Macon* plaintiffs were priority applicants, while Plaintiffs here are not, but that fact is not relevant to the issues here.

In the end, Plaintiffs do not seriously contest the statutory language.  Plaintiffs do point to other evidence that the RRF may have funds that could be redistributed.  For that argument, Plaintiffs rely on an audit report from the Office of the Inspector General relating to the distribution of RRF funds.  *See* U.S. Small Business Administration, Office of the Inspector General, *SBA's Oversight of Restaurant Revitalization Fund Recipients: Audit Report* (Report 23-15) (Sept. 29, 2023), available at https://www.sba.gov/sites/sbagov/files/2023-09/SBA%20OIG%20Report%2023-15.pdf.  The report, issued on September 29, 2023, found that the SBA distributed millions of dollars to certain entities that were not eligible and identified corrective measures to be taken to recover that money.  *See generally id.*  The report indicated that the SBA agreed to undertake certain administrative actions to recover unused funds or funds provided to ineligible entities in certain situations.  *Id.* at pp. 17–21.  The report concluded with the following sentence labeled under the heading "Other Matters": "By implementing corrective actions in this report, SBA could have more funds available to redistribute to RRF applicants that did not receive funding."  *Id.* at p. 16.  Plaintiffs argue this language means the SBA could reallocate recovered RRF funds.  (Doc. No. 93, p. 12.)  After all, the report was issued after the end of the "covered period."  (*Id.*)

Plaintiffs' interpretation of the report is misplaced.  First, the section Plaintiffs point to is

not part of the recommended actions the OIG suggested the SBA take.  Nor is it something the SBA agreed to.  Accordingly, unlike the accepted recommended actions the SBA agreed to implement, the redistribution of grants from the RRF was not one of them.  Second, and more fundamentally, the redistribution of RRF grants at this time is at odds with the end of the "covered period."  So, while the SBA might be able to redistribute funds in the future from the corrective actions suggested, it would take something more—namely, an act of Congress—for the SBA to follow through without the Plaintiffs having to immediately return that money to the Treasury.

Plaintiffs argue that at least some of their claims survive the mootness inquiry.  Specifically, Plaintiffs argue that they seek a declaration requiring the SBA to approve or deny all pending applications so that Plaintiffs can know their position in line.  (Doc. No. 93, p. 13.)  This argument is premised on the idea that if more funds become available, Plaintiffs will know if they are entitled to funds or not.  However, because this Court finds that the expiration of the "covered period" moots their claims, Plaintiffs requested relief would not "make a difference to the legal interests of the parties."  *McPherson*, 119 F.3d at 458.  Even if all applications are review and denied, Plaintiffs still cannot use the funds within the "covered period."  Thus, the relief sought to have a determination on all applicants is also moot.

This Court finds, like the court in *Reboot Macon* did, that the end of the "covered period" forecloses Plaintiffs' ability to use the funds even if RRF grants were reallocated.

### 3.    The Fiscal Responsibility Act

Plaintiffs' claims are moot for another reason.  On June 3, 2023, Congress passed the Fiscal Responsibility Act.  *See* Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10 (2023).  The FRA "permanently rescinded" all "unobligated balances of amounts" to many

COVID-19 relief programs, including the RRF.  *Id.* at § 52 ("The unobligated balances of amounts made available by section 5003(b)(2)(A) of Public Law 117-2 are hereby permanently rescinded.").

The crux of the mootness issue here depends on the meaning of "unobligated."  The SBA says that "unobligated" means any awards not already committed to a specific entity.  (Doc. No. 95, p. 7.)  In the SBA's view, any money recovered would immediately be "unobligated" to an entity and thus subject to recission.  (*Id.*)  The SBA sees the FRA as cutting short its ability to do any further distributions of funds.  (*Id.*)  The Plaintiffs argue that all RRF money is already obligated and that any money returned to the RRF is automatically obligated to the next eligible entity in line.  (Doc. No. 93, p. 15.)  In this way, Plaintiffs argue that all $28.6 billion originally appropriated to the RRF is obligated, whether some portions of that money are returned from entities or not.  (*Id.*)

The parties agree that the FRA does not define the term "unobligated."  An undefined term in a statute, of course, does not preclude a court from interpreting the law.  "When interpreting a statute we start, as we must, with the text."  *J. B-K. by E.B. v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*, 48 F.4th 721, 726 (6th Cir. 2022).  "When a statute contains an undefined term, we give the term its ordinary meaning."  *United States v. Zabawa*, 719 F.3d 555, 559 (6th Cir. 2013) (citing *United States v. Lumbard*, 706 F.3d 716, 723 (6th Cir. 2013)).  "In determining that meaning, dictionaries are a good place to start."  *Id.*  The SBA directs the Court to Merriam-Webster, which defines "unobligated" as "appropriated but remaining uncommitted by contract at the end of the fiscal period."  *See* Unobligated, Merriam-Webster, https://www.merriam-webster.com/dictionary/unobligated.  And the SBA cites to the Government Accountability Office's Glossary of Terms Used in the Federal Budget Process,

which defines "unobligated balance" as "[t]he portion of obligational authority that has not yet been obligated." *See* U.S. Gov't Accountability Office, *A Glossary of Terms Used in the Federal Budget Process* 72 (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf. Considering these definitions, and with respect to the RRF, the Court construes "unobligated balances of amounts" in the FRA to mean those funds that the SBA has not yet promised to pay to a specific entity that has applied and been approved for payment. In this case, that means applications that were not approved—including those that were not reviewed at all—are unobligated. Thus, if funds are returned to the RRF, there is no promise to pay the next eligible entity in line, and pursuant to the FRA, those funds must instead be returned to the Treasury. This is so because returned funds, at the time they are returned, are by nature uncommitted to any entity. In other words, because the SBA did not approve those pending applications, there was no commitment to pay. This is where Plaintiffs applications fall—Plaintiffs' applications for funding are all currently unobligated.

While not determinative, the Court is satisfied with this reading of the statute in light of statutory canons of construction. *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 256 (2020) ("The traditional canons of statutory interpretation are useful in determining whether the statutory text is susceptible to more than one reasonable interpretation.") (citing *United States v. Miller*, 734 F.3d 530, 541 (6th Cir. 2013)). Plaintiffs' interpretation of the FRA is not reasonable, in part, because their definition renders the FRA a nullity with respect to the RRF. According to Plaintiffs, all $28.6 billion in RRF funds are obligated, including funds that are returned to the RRF (which should automatically flow to the next eligible entity). The SBA distributed the last of the RRF grants in February 2023. (Doc. No. 90, p. 3.) But in June 2023, Congress "permanently rescinded" funds from the RRF. *See* Pub. L. No. 118-5 § 52, 137 Stat. at 28. If

Plaintiffs are correct that funds returned to the RRF are automatically obligated to the next eligible entity, the FRA's recission of RRF funding would be meaningless.  More pointedly, because all $28.6 billion in funds were obligated to specific entities and distributed prior to the FRA's enactment, there would be nothing for Congress to rescind except for returned funds.  Plaintiffs' interpretation cannot be squared with the presumption against ineffectiveness.  That presumption "reflects 'the idea that Congress presumably does not enact useless laws.'"  *In re Davis*, 960 F.3d 346, 354 (6th Cir. 2020) (quoting *United States v. Castleman*, 572 U.S. 157, 178 (2014) (Scalia, J., concurring)).  Thus, "when the plain meaning of a provision is not clear, we should avoid interpretations that render the provision a 'dead letter.'"  *Id.* (quoting *United States v. Hayes*, 555 U.S. 415, 427 (2009)).  Plaintiffs' interpretation does just that.  In the Court's interpretation of the FRA, Congress essentially closed the RRF.

Nevertheless, Plaintiffs point to ARPA, explaining that the law mandated funds "remain available until expended."  (Doc. No. 93, p. 15); § 9009c(b)(2)(A).  But that mandate does not override later congressional action.  The FRA specifically rescinded RRF funds, and so those funds were no longer available until expended.  Plaintiffs also argue that their interpretation of whether funds were obligated is consistent with the SBA's past practices.  (Doc. No. 93, p. 15.) While it is true that the SBA did previously reallocate money recovered for the RRF (Doc. No. 86, ¶ 43), the redistribution of those funds occurred before the end of the "covered period" and well before the FRA took effect.  Specifically, the SBA finished reallocating returned funds on February 23, 2023.  (Doc. No. 90, p. 3.)  Those redistributions run into none of the mootness problems Plaintiffs have here.  Lastly, as with their "covered period" argument, Plaintiffs point to the OIG report.  (Doc. No. 93, pp. 12–13.)  But those arguments fail with respect to the FRA just as they did for the "covered period."

In summary, the FRA, separate and apart from the end of the "covered period," moots all of Plaintiffs' claims in this action.

**III.** <u>**Conclusion**</u>

For the foregoing reasons, the SBA's motion to dismiss under Rule 12(b)(1) is **GRANTED**, and this matter is **DISMISSED**.[2]


**IT IS SO ORDERED.**


**Date**: May 3, 2024

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE

---

[2] Plaintiffs sought leave to file a sur-reply to the SBA's reply in support of its motion to dismiss. (Doc. No. 98.) That motion has been fully briefed. (Doc. Nos. 101, 102.) A sur-reply may be allowed where "new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated." *Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)). In consideration of the motion to dismiss papers, the Court concludes that the SBA's reply brief does not contain new arguments. The Court denies Plaintiffs' motion.